IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22–cv–00433–NYW–MDB

KENDRA E BOWERS,

     Plaintiff,

v.

CLUB WYNDHAM a/k/a WYNDHAM HOTELS AND RESORTS a/k/a WYNDHAM
DESTINATIONS a/k/a WYNDHAM WORLDWIDE CORPORATION a/k/a WYNDHAM
VACATION RESORTS a/k/a WYNDHAM VACATION OWNERSHIP a/k/a FAIRFIELD
RESORTS, INC a/k/a FAIRFIELD COMMUNITIES, INC.,

     Defendant.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Maritza Dominguez Braswell**

     Before the court is "Defendant's Motion to Dismiss," filed pursuant to Federal Rule of

Civil Procedure 12(b)(6). (["Motion"], Doc. No. 9). Plaintiff, who is a *pro se* litigant, has

responded in opposition to the Motion, Defendant has replied, and Plaintiff has surreplied.[1]

(["Response"], Doc. No. 28; ["Reply"], Doc. No. 32; ["Surreply"], Doc. No. 33.) For the

following reasons, it is **RECOMMENDED** that the Motion be **GRANTED**.

---

[1] The Court notes that Plaintiff neither sought nor obtained leave to file a surreply in this matter.
Given that the Local Rules of this District do not contemplate surreplies, Plaintiff's filing was thus
improper.  *See* D.C.COLO.LCivR 7.1(d). However, in light of Plaintiff's *pro se* status, the Court
accepts the Surreply for consideration.  *See Gibson v. Campbell*, No. 09-00983-WYD-KLM, 2012
WL 4442727, at *2 (D. Colo. Aug. 21, 2012) (considering a *pro se* plaintiff's improper surreply
in connection with a motion to dismiss).

**STATEMENT OF THE CASE**

**I. Plaintiff's Allegations**

Plaintiff Kendra E. Bowers ["Plaintiff"] brings this action against Defendant Club Wyndham a/k/a Wyndham Hotels and Resorts a/k/a Wyndham Destinations a/k/a Wyndham Worldwide Corporation a/k/a Wyndham Vacation Resorts a/k/a Wyndham Vacation Ownership a/k/a Fairfield Resorts, Inc. a/k/a Fairfield Communities Inc. ["Defendant"], alleging misconduct arising from various timeshare point purchases. (["Complaint"], Doc. No. 4.) According to the Complaint, Plaintiff owns a large number of timeshare points and rents them out to produce income. (*Id.* at 1-5 ¶¶ 4-32.) Plaintiff alleges that, since 2006, Defendant has "consistently and continually launched an 'attack' against mega-owners/renters," such as herself, in an effort to "force them out of the business[.]" (*Id.* at 8-9 ¶ 39.) She alleges that Defendant is forcing people like her out of the rental business, so that Defendant's rental arms will "benefit by the profits that individual owner's [sic] used to enjoy." (*Id.*)

Plaintiff recites a history of her timeshare purchases and interactions with Defendant, including the issues that led to a prior lawsuit against Defendant. (*Id.* at 1-8 ¶¶ 4-38.) The prior lawsuit, filed in 2008, was the subject of a settlement in 2009. (*Id.* at 7-9 ¶¶ 36-38, 40.) Plaintiff alleges that, since that settlement, "there have been more Wyndham changes that have continued to erode the benefits of premium ownership." (*Id.* at 9 ¶ 40.) She lists examples of Defendant's post-settlement efforts to "continue[] to erode the benefits of premium ownership." (*Id.* (alleging that guests are not allowed at numerous high demand resorts during high demand times, that Defendant prohibits commercial use, and that Defendant limits its free guest certificates).)

Plaintiff alleges that the "most grievous" act by Defendant was to send her an unsigned letter, dated October 1, 2021, that stated, "[i]f any of your future reservations include commercial use, they need to be cancelled immediately. If commercial use is identified with any of your future reservations, all such reservations will be cancelled, including any reservations that have check-in dates within the thirty (30) day of identification." (*Id.* at 9 ¶ 41.) Plaintiff alleges that she received this letter without warning. (*Id.*) She also alleges that, on November 30, 2021, she replied by email and certified mail "to Jessica Swift (Owner Resolution and Strategy Care Manager)," expressing her "concerns about this demand and Wyndham's continuing stance to erode VIP benefits." (*Id.* at 9 ¶ 42.) Plaintiff asks that she be "exempted" from "new, past and future draconian measures," and demands that she be "grandfathered in." (*Id.*) Plaintiff alleges that, to date, she has not received a response from Defendant. (*Id.*) Plaintiff also alleges that, on January 5, 2022, she asked "Jessica Swift to reinstate 18 'free' guest certificates to her account and refund her $198 for two paid guest certificates ($99 each)." (*Id.* at 10 ¶ 43.) Plaintiff alleges that the cancellations were due to COVID. (*Id.*) Plaintiff alleges she did not receive a response to that message, either. (*Id.*)

Plaintiff closes her Complaint by alleging that Defendant has "continually and persistently eroded Club Wyndham owner benefits." (*Id.*) According to the Complaint,

> Defendant has known from the 'get go' that the Plaintiff was buying inventory **ONLY** as a rental investment. This was **NO** secret. Not only was she encouraged to do it but also was shown how it could be done by **The Defendant's** own sales staff. If it wasn't for the support of this sales staff, the Plaintiff would **NEVER** have purchased anything more than her original 'Discovery Package' in 1999.

(*Id.* (emphasis in original).) As relief, Plaintiff demands monetary damages "in an amount to cover 2021 and 2022 lost gross income calculated at $.01 per point to be $100,000 and any other

such relief as to [sic] the Court may deem proper." (*Id.*) Plaintiff also requests that her "account be grandfathered 'in' so that she can continue to do what she was promised by the Plaintiff's [sic] sales staff since early 2000." (*Id.*). In addition, Plaintiff asks:

- for "future unlimited guest reservations/PIC transactions and RCI exchange fees at **NO cost**,"
- for the right to "cancel reservations within 24 hours of check-in,"
- for the right to "make multiple reservations at any resort with **NO** restrictions,"
- for the right to "make guest reservations inside their 'defined owner only window,'"
- for the right to "add an additional four names to her account as POA," and "transfer her account to her son E Grant Bowers and his children at **no cost** and with **no hassles**,
- to not "be bound to any past, present and future 'guidelines'/goalposts/rules/regulations/restrictions."
- that "she and her heirs will NEVER be denied full benefits for an owner at the highest level who has 4,922,000 Wyndham points,"
- "to be given annually 50 free night stays at any or all of Wyndham Hotels & Resorts[.]"

(*Id.* (emphasis in original).)

## II.  Defendant's Motion

Defendant moves to dismiss Plaintiff's Complaint, in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 9.) Specifically, Defendant argues that Plaintiff impermissibly renews the same lawsuit she filed years ago, and that the plain terms of the settlement agreement in that prior case bars this action. (*Id.* at 8-9.) Defendant also argues that Plaintiff's action is barred by the doctrines of issue and claim preclusion, and that even if it is not, Plaintiff's allegations are vague, ambiguous, and insufficient to state a viable claim against Defendant because, among other things, Plaintiff has not alleged a theory of liability, or identified a contract or agreement that was breached. (*Id.* at 7, 10-13; Doc. No. 32 at 4.) Finally,

Defendant argues that Plaintiff has named "improper entities as supposed Defendants" in this lawsuit, and that all entities except "Wyndham Vacation Resorts, Inc." should be dismissed. (Doc. No. 9 at 1, 14-15.)

### III.  The Prior Lawsuit and the Confidential Settlement Agreement

In 2008, Plaintiff sued Defendant in connection with her timeshare purchase and use. *Bowers v. Wyndham Vacation Resorts*, No. 1:08-cv-02502-REB-MEH (D. Colo. dismissed May 12, 2009) [hereinafter "*Bowers I*"]. The parties in *Bowers I* ultimately reached a settlement as to all claims, on May 8, 2009.  (Doc. No. 13); *see* Minute Entry for Settlement Conference, *Bowers I*, No. 1:08-cv-02502-REB-MEH (D. Colo. May 7, 2009), ECF No. 31.  The case was thereafter dismissed with prejudice. Order of Dismissal, *Bowers I*, No. 1:08-cv-02502-REB-MEH (D. Colo. May 12, 2009), ECF No. 34.

Plaintiff now argues that her prior lawsuit against Defendant "only peripherally addressed the issues that are addressed now." (Doc. No. 28 at 2-3.) She describes the nature of her claims in *Bowers I* as concerning "disputes that arose over the Plaintiff's contracts….Being the largest Wyndham timeshare owner at the time, their system was 'overwhelmed' with the Plaintiff's ownership and many mistakes were made and not corrected." (*Id.*) Plaintiff argues that the "purpose" of her prior lawsuit against Defendant "was to resolve the **Many** issues regarding [her] five Wyndham account numbers," while the "purpose" of this lawsuit "is requesting to be 'grandfathered' in and to be able to use the VIP Platinum benefits that she was promised when she made her purchases from Nov, 2001-July, 2005." (Doc. No. 33 at 1-2 (emphasis in original).)

Still, in *Bowers I*, Plaintiff made many of the same allegations she makes in this, her second, lawsuit against Defendant. *See* Notice of Removal Ex. A-C, *Bowers I*, No. 1:08-cv-

02502-REB-MEH (D. Colo. Nov. 19, 2008), ECF No. 1-1 [hereinafter "*Bowers I* Complaint"].

For example:

| *Bowers I* Complaint | Current Complaint |
|---|---|
| ¶ 7: Plaintiff was invited to Angel Fire, NM in Sept, 2000 for three days/two nights to listen to a presentation to buy a timeshare from Fairfield Resorts and at that time purchased a 126,000 point pacakage using the payment from the Discovery program cost as down payment and later paying fot the timeshare in full ($12,800) – UDI (undivided interest) #80-000-9219. | ¶ 10: In Sept, 2000 the Plaintiff was invited to Angel Fire, NM for three days/two nights to listen to a presentation to buy a timeshare from Fairfield Resorts and at that time purchased a 126,000 point package using the payment from the Discovery program cost as down payment and later paying for the timeshare in full ($12,800) – UDI (undivided interest) #80-000-9219 |
| ¶ 14: While in Sedona the Plaintiff attended a 'sales presentation' in which the salesman, Dennis Bailey, explained a business model to the Plaintiff in which the Plaintiff could make Fairfield reservations and rent them for a nice profit[.] | ¶ 14: While in Sedona the Plaintiff attended a 'sales presentation' in which the salesman, Dennis Bailey, explained a business model to the Plaintiff in which the Plaintiff could make Fairfield reservations and rent them for a nice profit[.] |
| ¶¶ 49-50: On May 9, 2006 the Plaintiff and three other Fairfield 'mega-owners' each had a private 60-90 minute meeting," where "each of the four 'mega-owners' was interviewed as to her/his business model for making a livelihood by renting Fairfield timeshare and a few weeks later major changes were implemented by Fairfield Resorts to 'discourage' individuals from doing this[.] | ¶¶ 36-37: On May 9, 2006 the Plaintiff and three other Fairfield 'mega-owners' each had a private 60-90 minute meeting," where "each of the four 'mega-owners' was interviewed as to her/his business model for making a livelihood by renting Fairfield timeshare and a few weeks later major changes were implemented by Fairfield Resorts to 'discourage' individuals from doing this[.] |
| ¶ 183: Since May 2006 Wyndham VO has consistently and continually launched an 'attack' against mega-owners/renters to force them out of business so that their rental arm, Extra Holidays can benefit by the profits that individual owner's used to enjoy. The Plaintiff has been one of the 'mega-owners/renters' singled out by Wyndham to be 'destroyed' so that Wyndham may continue to 'reap the profits' that used to belong to her and others. | ¶ 39: In 2006 Fairfield was rebranded as Wyndham Vacation Ownership and since then they have consistently and continually launched an 'attack' against mega-owners/renters to force them out of business so that their rental arms, Extra Holidays and Endless Vacations, can benefit by the profits that individual owner's used to enjoy. The Plaintiff has been on one of the 'mega-owners/renters' singled out by Wyndham to be 'destroyed' so that Wyndham may continue to 'reap the profits' that used to belong to her and others. |

Indeed, many of the allegations in the present lawsuit are a cut and paste from, and/or

substantially similar to, the allegations made in Plaintiff's 2008 lawsuit.

Plaintiff's allegations in this lawsuit do differ from *Bowers I* in some respects. For instance, in *Bowers I*, Plaintiff alleged much more detail about the transactions and interactions that occurred between Plaintiff and Defendant between 1999 and 2007. In *Bowers I*, Plaintiff also alleged that her accounts were "flagged," and that Defendant delayed addressing her requests to sort through her accounts. *Bowers I* Compl. ¶¶ 184-90. However, the overall thrust of Plaintiff's allegations in *Bowers I* was that Defendant deliberately caused Plaintiff to lose income, because Defendant was launching an "attack" on mega-owners like Plaintiff who sought to rent their points. *Id.* at ¶¶ 183, 187, 192. In other words, the conduct at the center of *Bowers I* was the same conduct at issue in this case—Defendant's alleged efforts to force Plaintiff out of business and reap the profits associated with rentals.

In *Bowers I*, the parties mediated the claims before Magistrate Judge Michael Hegarty. Minute Entry for Settlement Conference, *Bowers I*, No. 1:08-cv-02502-REB-MEH (D. Colo. May 7, 2009), ECF No. 31. Plaintiff alleges that after a ten-hour mediation, the issues "were jointly resolved." (Doc. No. 4 at 7 ¶ 37.) Pursuant to the parties' resulting settlement agreement [hereinafter "the 2009 Settlement Agreement"], Plaintiff was allowed to maintain one of her accounts so long as she complied with "current and future" rules. (Doc. No. 13 at ¶ 7.) Additionally, Defendant paid Plaintiff a sum certain and gave her access to a certain number of points. (*Id.* at ¶¶ 3, 9.) The parties also agreed to the following provision:

> Paragraph 1: Except as to the obligations to be performed under this Settlement Agreement, the parties hereby release and forever discharge each other, their subsidiaries, parents and affiliated companies (including but not limited to the Fairshare Vacation Owners Association and/or its Directors), their directors, officers, shareholder, agents and employees, of an from all claims, demands, liabilities, damages, fees, causes of action, or suits in law or equity, knowns or unknown, which have arisen or may hereafter arise in connection with Civil Action No. 08-cv-02502-RED, District of Colorado.

(*Id.* at ¶ 1.) Other than the filing of an answer, counterclaims, and amended counterclaims, there appears to be limited activity on the *Bowers I* docket.

In her Response, Plaintiff does not dispute the existence or validity of the 2009 Settlement Agreement; indeed, she says, "[a]t the ten hour [sic] Settlement Conference on May 5, 2009, these issues were resolved." (Doc. No. 28 at 3.) Moreover, in her Response, Plaintiff addresses the arguments in Sections I, II, III, IV.A., IV.C., and IV.D. of Defendant's Motion, but does not address the arguments set forth in Section IV.B of Defendant's Motion, entitled, "The Settlement Agreement bars Plaintiff's relief." (*Compare* Doc. No. 9, *with* Doc. No. 28.) In her Surreply, Plaintiff does not directly address the 2009 Settlement Agreement, other than to state that she "disagrees" with Defendant's arguments concerning its scope, applicability, and enforceability. (Doc. No. 33 at 3-4.) Plaintiff does not deny that the 2009 Settlement Agreement is valid, and she does not deny that she received consideration as set forth in the 2009 Settlement Agreement. (*See generally* Doc Nos. 4, 28, 33.)

**STANDARDS OF REVIEW**

**I.  *Pro Se* Plaintiff**

Plaintiff is proceeding *pro se*.  The court, therefore, "review[s] h[er] pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding the allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers").  However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).  A

court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (stating that a court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). The plaintiff's *pro se* status does not entitle her to an application of different rules. *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

## II. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a Rule 12(b)(6) motion to dismiss,

means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," *i.e.,* those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, the claim survives the motion to dismiss. *Id*. at 679.

That being said, the court need not accept conclusory allegations without supporting factual averments. *S. Disposal, Inc., v. Tex. Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). Still, all that is required is plausibility, not probability. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Indeed, a well-pleaded Complaint can survive a motion to dismiss even if "recovery is very remote and unlikely." *Twombly* at 555 (quoting *Scheuer v. Rhodes*, 416 U.S. 232 (1974)).

In evaluating a Rule 12(b)(6) motion to dismiss, the court typically may not look beyond the pleadings. *Casanova v. Ulibarri*, 595 F.3d 1120, 1125 (10th Cir. 2010). "Pleadings," for

purposes of a Rule 12(b)(6) motion to dismiss, however, include attachments to the complaint, documents incorporated into the complaint by reference, and information subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). Documents attached to a motion to dismiss are considered part of the pleadings, if they are referred to in the complaint, and are central to the plaintiff's claims. *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

Here, Plaintiff has attached fifty-three pages of documents to her Response, including a revised version of her 2008 complaint with redline edits, a typewritten letter of correspondence, emails, screenshots of text messages, and a computer spreadsheet. (Doc. No. 28-1.) Plaintiff has likewise attached what appear to be duplicate copies of these documents to her Surreply. (Doc. Nos. 33-1, 33-2, 33-3.) However, the Court has not relied on any of these documents in ruling on the present Motion.

Defendant has, itself, submitted a copy of the 2009 Settlement Agreement entered into by the parties in *Bowers I*. (Doc. No. 13; *see* Doc. No. 14.) Plaintiff does not dispute the document's authenticity, and she makes explicit reference to the 2009 Settlement Agreement in her Complaint. (*See* Doc. No. 1 at ¶ 38 ("For a complete history of how the Plaintiff lost her home and has been a wanderer/nomad/traveler/roamer/drifter with no permanent residence since July 2008 . . . please see the 'Settlement Agreement' for Case #: 1:08-cv-2502.").) Moreover, the 2009 Settlement Agreement appears to be central to Plaintiff's claims regarding what she believes is presently owed to her by Wyndham, in connection with her timeshare ownership interests. Therefore, the Court will consider the 2009 Settlement Agreement in ruling on the

present Motion. *See Silva v. US Bank, Nat'l Assoc.*, 294 F. Supp. 3d 1117, 1125 (D. Colo. 2018), *report and recommendation adopted sub nom. Silva v. US Bank, Nat'l Assoc. as Tr. under Pooling & Serv. Agreement dated as Feb. 1, 2007*, No. 17-CV-1529-WJM-KLM, 2018 WL 10561514 (D. Colo. Mar. 19, 2018) (considering a settlement agreement submitted with a motion to dismiss, where the document was referenced within the complaint, central to the plaintiff's claims, and not challenged as inauthentic, and where the defendant argued that the settlement agreement barred the plaintiff's claims).

## ANALYSIS

Defendant argues that the 2009 Settlement Agreement and/or the doctrines of issue and claim preclusion bar this action. (Doc. No. 9 at 8-14.) As already noted, Plaintiff does not dispute the existence or validity of the 2009 Settlement Agreement, and indeed refers to it in her Complaint, in her Response, and in her Surreply. (*See* Doc. No. 1 at ¶ 38; Doc. No. 28 at 3; Doc. No. 33 at 3-4.) Moreover, Plaintiff does not meaningfully refute Defendant's preclusion arguments, and in her Response, she altogether avoids responding to Defendant's argument that the 2009 Settlement Agreement bars her claims. However, given Plaintiff's *pro se* status, the Court liberally construes the assertion made in Plaintiff's Response— that the prior lawsuit "only peripherally addressed the issues that are addressed now[,]"—as a rejection of Defendant's contention that the 2009 Settlement Agreement bars the instant claims. (*See* Doc. No. 28 at 2-3.) Additionally, in her Surreply, Plaintiff makes clear that she "disagrees" with each of the following statements from Defendant:

- "…the 2008/2009 Settlement Agreement expressly resolved the entire case…"
- "The Court must enforce the Settlement Agreement as agreed."
- "…whether Plaintiff's 2008 lawsuit addressed every 2008 allegation squarely or only 'peripherally' is immaterial."

12

- "Even if were true that the claims were addressed peripherally, those claims that were brought or that could have been brought would still be precluded under issue or claim preclusion."
- Plaintiff had a full and fair opportunity to squarely address every issue claimed in her 2008 Complaint."
- "…the issues addressed were identical…"
- "…the current Complaint is barred."

(Doc. No. 33 at 4.) Thus, the Court will treat Plaintiff's Response and Surreply as asserting arguments against preclusion, and will analyze the preclusive effect of her prior lawsuit against Defendant.

As a threshold matter, the Court notes that Defendant's preclusion arguments fall into two categories: preclusion based on the 2009 Settlement Agreement, and preclusion based on the doctrines of issue and claim preclusion. The Tenth Circuit recently considered the preclusive effect a settlement agreement alongside the doctrines of claim and issue preclusion. *Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259 (10th Cir. 2022). It found that settlements, which are contracts, "can supplant traditional preclusion principles 'if it is clear that the parties intended preclusion as part of their agreement.'" *Id.* at 1271 (quoting *In re Young*, 91 F.3d 1367, 1376 (10th Cir. 1996)). The court focused almost exclusively on the terms of the prior settlement agreement, noting that it was "not necessary to establish" certain elements of common law preclusion, such as privity, "where the plain language of the settlement agreement inoculates each individual defendant from the relevant claim." *Id.* at 1273.

Here, the plain terms of the 2009 Settlement Agreement demonstrate the parties' intent to preclude future suits that arise "in connection with" *Bowers I*. (Doc. No. 13 at ¶ 1.) Plaintiff does not appear to dispute that. Instead, Plaintiff appears to argue that her present lawsuit does not arise "in connection with" *Bowers I*, because the two lawsuits were brought for different

purposes. (Doc. No. 33 at 1-2.) Because the plain language of the 2009 Settlement Agreement reflects the parties' intent to preclude at least some lawsuits, and because the Plaintiff does not allege or argue otherwise, the Court will focus on the terms of the 2009 Settlement Agreement, rather than applying the elements of claim and issue preclusion. *Denver Homeless*, 32 F.4th at 1273.

   Next, the Court considers the scope of the release in the 2009 Settlement Agreement. In *Denver Homeless*, the Tenth Circuit found the release at issue had broad application, in that it barred:

> all liabilities, claims, demands, rights, controversies, agreements, damages, actions, causes of actions, expenses, attorney fees, interest, compensation, judgment and any and all consequential and punitive damages, of whatsoever kind and nature, either in law or in equity, which might exist or might be in any way related to or giving rise to above-referenced Lawsuit, including, but not limited to, any and all claims arising out of the City's alleged custom or practice (written or unwritten) of sending ten ore more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there.

32 F.4th at 1272. There, the parties also agreed that plaintiffs would not bring any action "relating to the facts and claims which were or could have been asserted in their Claim against the Released Parties or … relating to the facts and allegations concerning the events outlined in the Amended Complaint[.]" *Id.* The *Denver Homeless* plaintiffs argued that even if certain custom and practice claims were released, their custom and practice claims were based on *post*-settlement conduct and therefore constituted an entirely new cause of action that was necessarily not precluded. *Id.* at 1274. The Tenth Circuit disagreed, because both complaints took issue with the same custom and practice by the *Denver Homeless* defendant.  As the court explained:

> The complaints in both cases argue Denver's multi-year custom and practice of sweeping homeless encampments without proper notice or opportunity to recover seized property violates the class's procedural due process rights. Thus, the event material to our preclusion analysis is Denver's ongoing implementation of this custom—not the discrete activities occurring at each sweep. This is consistent with our pragmatic approach to res judicata, which treats circumstances that 'are related in time, space, origin, or motivation as singular claims.

*Id.* at 1275 (citing *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1149 (10th Cir. 2006)).

Here, like in *Denver Homeless*, the release at issue has broad application and the two lawsuits concern the same alleged conduct and practices by Defendant. First, while the release in this case is not as robust as the release in *Denver Homeless*, it is still broadly worded to release Defendant from "all claims, demands, liabilities, damages, fees, causes of action, or suits in law or equity, known or unknown, which have arisen or may hereafter arise in connection with Civil Action No. 08-cv-02502-RED, District of Colorado." (Doc. No. 13 at ¶ 1.) The language, "which have arisen or may hereafter arise in connection with [the prior action]," is not identical, but very similar to, the release language in *Denver Homeless*. *See Denver Homeless*, 32 F.4th at 1273 (where the release language was, "relating to the facts and claims which were or could have been asserted in their Claim against the Released Parties or . . . relating to the facts and allegations concerning the events outlined in the Amended Complaint"). Like in *Denver Homeless*, the release here concerns all past, present, and future claims that tie back to the prior complaint.

Second, *Bowers I* and this lawsuit concern the same alleged conduct. In 2008, Plaintiff alleged there had been several "delays," "problems," "difficulties," and "missing and/or moved contracts" associated with her various accounts over the years. *Bowers I* Compl. ¶¶ 26, 34, 36, 45-46. Plaintiff alleged that she made several attempts to resolve the issues, and that she spoke

with Defendant's representatives in an effort "to get help to get her accounts in good order/usable[.]" *Id.* at ¶ 51. Plaintiff's 2008 complaint recited many interactions with Defendant's representatives, as well as challenges she faced as she attempted resolve her account issues. *Id.* at ¶¶ 52-71. And while at first blush, many of those allegations look distinct from the allegations in the present lawsuit, a closer look reveals that they are part of a larger concern and general claim at the center of Plaintiff's 2008 claims. In 2008, Plaintiff alleged that Defendant was launching an "attack" against Plaintiff and attempting to force her and other "mega-owners" out of their livelihood. *Bowers I* Compl. ¶ 183. Plaintiff described, in detail, Defendant's alleged "intentional plan to eliminate the individuals who have earned a livelihood by renting Wyndham Vacation Resorts." *Id.* She alleged that Defendant's "negative and detrimental actions" were "directed to [Plaintiff] personally," and "intended to deny her a means of producing a livelihood, providing her a place to live and eliminating her ownership with Wyndham Vacation Ownership." *Id.* at ¶ 192. Those allegations at the center of *Bowers I* are substantially similar to (and in some cases the same as) the allegations in the present lawsuit.

Like in 2008, Plaintiff presently alleges that Defendant has "consistently and continually launched an 'attack' against mega-owners/renters to force them out of business[.]" (Doc. No. 4 at 8 ¶ 39.) Indeed, the key paragraphs of the Complaint here, which describe Defendant's intentional acts, are nearly identical to the key paragraphs in the 2008 complaint describing Defendant's intentional acts. For example, in this case, Plaintiff describes Defendant's alleged "intentional plan to eliminate the individuals who have earned a livelihood by renting Wyndham Vacation Resorts[.]" (*Id.*) That "plan" has four detailed parts, and appears to be a cut and paste from the four-phase plan alleged by Plaintiff in her previous lawsuit. *See Bowers I* Compl. ¶

183. The overall thrust of the present Complaint is a claim that Defendant is attempting to force Plaintiff out of business, which is precisely the claim Plaintiff made in 2008. *Id.* Thus, just like in *Denver Homeless*, the subject of this litigation is the same as the subject of the first litigation.[2]

Notably, almost all of Plaintiff's allegations in this lawsuit concern events that occurred prior to *Bowers I*. (*See* Doc. No. 4 at 1-7 ¶¶ 4-34.) However, there are a handful of allegations concerning events that occurred *after* the 2009 Settlement Agreement was executed. (Doc. No. 4 at 9-10 ¶¶ 40-43.) Specifically, Plaintiff alleges that, since the parties' execution of the 2009 Settlement Agreement, "there have been more Wyndham changes that have continued to erode the benefits of premium ownership." (*Id.* at 9 ¶ 40.) Plaintiff alleges that the "changes" imposed by Defendant "include but are not limited to NO guests allowed at numerous 'high demand resorts at high demand times', no "commercial use" and more limited 'free' guest certificates[.]" (*Id.*) She also alleges that the "[t]he most grievous" post-settlement act was a letter from Defendant requiring her to cancel any future reservations that include commercial use. (*Id.* at ¶ 9 41.) And, she alleges that she has requested, but not received, reinstatement of free guest certificates after reservations had to be cancelled due to COVID. (*Id.* at 10 ¶ 43.) However, even those post-settlement acts are related in origin and motivation to the singular claim that Defendant is allegedly attacking mega-owners like Plaintiff and attempting to force Plaintiff out of business. *See Denver Homeless*, 32 F.4th at 1275 (finding that even post-settlement acts are barred by a release in a settlement agreement where those post-settlement acts are part of an

---

[2] *Denver Homeless* concerned a class settlement and other circumstances that are not present here. However, the distinguishing factors do not diminish the decision's applicability, because the relevant portions of the Tenth Circuit's holding were decided as a matter of law and based almost exclusively on the plain text of the settlement agreement. *See* 32 F.4th at 1271-77.

overall approach or custom that was the subject of the prior litigation; and reasoning that each of

defendant's discrete activities, no matter when they occurred, are still part of singular claim).

In *CommunityCare HMO, Inc. v. MemberHealth, Inc*., No. 06-CV-197-TCK-SAJ, 2006

WL 6130987 (N.D. Okla. May 8, 2006), the court considered a similar dispute and held that a

claim based on post-settlement acts was not barred and could form the basis of a new lawsuit. *Id.*

at *5-6. That case is not binding on this Court, and in any event, is distinguishable, because "the

plain language of the Settlement Agreement limit[ed] the release to 'any and all actions, causes

of actions, claims and demands of any nature asserted or which could have been asserted in Case

No. 05-CV630 TCK-FHM.'" *Id.* at *5. The *CommunityCare* court explained that, based on this

language, the "[a]lleged violations occurring after the Settlement Agreement, could not have

been asserted in that lawsuit," and were therefore not barred. *Id.* at *5-6. The court was careful to

observe the contrast between the release in that case, and other releases that are "more broadly

worded[.]" *Id.* at *5 (citing *Augustine Med., Inc. v. Progressive Dynamic, Inc.*, 194 F.3d 1367,

1371 (Fed.Cir.1999)). It noted that more broadly worded releases could indeed release and bar

claims based on post-settlement conduct. *Id.*

The release here does not contain the limiting language found in the *CommunityCare*

release. And, while the release here is not as robust as the release in *Denver Homeless*, it

nevertheless covers "all claims, demands, liabilities, damages, fees, causes of action, or suits in

law or equity, known or unknown, which have arisen or may hereafter arise in connection with

Civil Action No. 08-cv-02502-RED, District of Colorado." (Doc. No. 13 at ¶ 1.) The release

covers the present suit, because Plaintiff's Complaint arises in connection with the prior action,

and more specifically, because Plaintiff's Complaint is based on the exact same conduct alleged

in the prior action—Defendant's allegedly intentional efforts to force Plaintiff out of business. Indeed, Plaintiff concedes that Defendant's *current* efforts are simply a continuation of its *prior* efforts. (Doc. No. 4 at 9 ¶ 40 (alleging that after the parties settled *Bowers I*, Defendant "*continued* to erode the benefits of premium ownership," and describing many of the same allegedly wrongful acts by Defendant, such as, denying guest access, limiting commercial use, and limiting free guest certificates); *see Bowers I* Compl. ¶ 183 (alleging denials of guest access, limits on commercial use, and limits on free guest certificates). In short, by its plain terms, the 2009 Settlement Agreement bars this action.  For that reason, this case should be dismissed.[3]

## RECOMMENDATION

**WHEREFORE**, for the foregoing reasons, this court respectfully

**RECOMMENDS** that "Defendants' Motion to Dismiss Complaint (ECF No. 1) Pursuant to Fed. R. Civ. P. 12(b)(6)" (Doc. No. 9) be **GRANTED**. It is further

---

[3] Even assuming the 2009 Settlement Agreement did *not* bar this lawsuit, the Court agrees with Defendant that Plaintiff's allegations, even liberally construed, are too general and conclusory to state a claim for relief. Plaintiff alleges that after the parties settled *Bowers I*, Defendant "continued to erode the benefits of premium ownership," banned guests from "high demand resorts at high demand times," restricted "commercial use," and limited "'free' guest certificates." (Doc. No. 4 at 9 ¶ 40.) She also alleges that she has not received reimbursement for previously cancelled reservations due to COVID. (*Id.* at 10 ¶ 43.) These allegations describe post-settlement conduct that Plaintiff *believes* is wrongful, but they do not set forth a legally sound basis for why they are wrongful or why she is entitled to the benefits she claims to be owed. Plaintiff does not, for example, cite to a specific contract provision that Defendant breached. Nor does Plaintiff allege that Defendant made a specific promise that was breached. She likewise does not claim that Defendant breached the 2009 Settlement Agreement. Instead, Plaintiff—generally and in conclusory fashion—alleges that she is entitled to these benefits, and that Defendant is eroding these benefits. (*Id.* at 9-11 ¶¶ 40-43.) Even applying a very lenient standard and viewing all allegations in the light most favorable to Plaintiff, the Court cannot find any allegations or combination of allegations that amount to a viable claim for relief.

**RECOMMENDED** that this case be **DISMISSED**.

**ADVISEMENT TO THE PARTIES**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342,

1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).  .

Dated this 2nd day of September, 2022.

BY THE COURT:

Maritza Dominguez Braswell
United States Magistrate Judge